Oyez! Oyez! All persons having business with the Honorable United States Court of Appeals for the Third Circuit are admonished to draw near and give their attention, for this court is now in session. God save the United States and this Honorable Court. Please be seated. Good morning, ladies and gentlemen. As you have just heard, we are sitting here as the Third Circuit Court of Appeals panel, and as the parties well know, I don't know if there are any non-parties here, but for their benefit and for the record, a motion was made to appoint an out-of-circuit panel. The Chief Justice did so, and we have that. I am Judge Laurie of the Federal Circuit in Washington. Judge Jane Westani is here, Chief Judge of the Court of International Trade in Washington. And my videoconference, and I see him on my left, Judge Louis Oberdorfer of the District Court for the District of Columbia. Judge Oberdorfer unexpectedly incurred a health problem last week that prevented him from traveling, but he is obviously connected to the courtroom and can hear everything and ask questions and will participate in the appeal. Thank you, Judge Laurie. Yes, good morning, Judge Oberdorfer. Good morning, ladies and gentlemen. Our only case this morning is 05-4329, John McLaughlin v. Michael Fisher, et al., and the appellants do not include Michael Fisher, Gerald Papert, James Sarteski, David Quaid, and James Caggiano. Mr. McLaughlin is appearing for appellants. Please proceed. Thank you, Your Honor. May it please the court, counsel. I'm Tom McLaugh representing the appellants in this appeal, and I'd like to reserve four minutes for rebuttal if I could. I'd like to focus, at least initially, on why appellants are entitled to judgment as a matter of law. That, of course, raises the issue preclusion point as well as the sufficiency of the evidence point, which we believe are intertwined to a certain extent. But before turning to that, let me first address the issue that was raised in yesterday's letter from the court regarding the preclusive effect of Unemployment Compensation Board decisions under Pennsylvania law. The implication of the court's letter is absolutely correct, of course. The Third Circuit has decided that Unemployment Compensation Board… That's the Labor Relations Board, right? It's not the Pennsylvania Labor Relations Board. It's a different body. It's the UCB Unemployment Compensation Board in Kelly v. TYK and the Swineford case. The Third Circuit predicted, basically because it's a question of state law, predicted that Pennsylvania would not give preclusive effect to decisions by the UCB. And, in fact, a few years later, in 1998, in the case of Rue v. Kmart, 7-13 Atlantic 2nd 82, and this, by the way, is cited by the district court in its opinion that's attached as an appendix at page 26. The Pennsylvania Supreme Court in Rue confirmed the prediction made by the Third Circuit that, in fact, preclusive effect should not be given to UCB decisions. But it did so because of the unique nature, and, in fact, it's a singular exception to the preclusive effect generally given to the ruling of administrative bodies. In Rue, the court pointed out that unemployment compensation decisions are supposed to be quick. Their purpose is to alleviate economic hardship on the part of the person who might be entitled to the benefits. The court cited as a second factor that there was little incentive under Pennsylvania law and Pennsylvania's insurance system for employers to come in and contest the unemployment decision because, as a result, it had little economic impact. It's not relevant to our case. It went off on the fourth factor of the issue preclusion test, which was is there a full and fair opportunity to litigate? And the court said, given the unique nature of these proceedings, it's not. Actually, the Rue case, I suppose, helps you in a little way because it says a fact is a fact. And for identity issues, you're not worried about different policy doesn't affect identity of issues. Of course, the fact in Rue was the stolen bag of potato chips. Right. So I think we have a more, I guess, even though you would say we have an identity of ultimate issues of fact, there's something a little more complicated about the ultimate fact question here than the bag of potato chips. I think it's certainly more complicated than was there a theft of the bag of potato chips. Yes or no. And the PFC, the Pennsylvania Labor Relations Board decisions have been given preclusive effect by every court that has considered it. There's no there's no binding precedent on this panel on that point. There's a Pennsylvania Commonwealth Court opinion called Blau's Ball. And we cite these cases at pages 30 and 31 of our brief. Was the same issue decided by the district court here as was decided by the Labor Relations Board? Yes, it was. The core issue was why were these why were these agents transferred? And what the Pennsylvania Labor Relations Board explicitly held was that there was a legitimate business reason to transfer them. Is that what they held or that there was no retaliation? Well, then they held that they held as well that the agents who put in basically the same case that they put in before the district court failed to prove that there was retaliation for refusing the transfer to Harris to Morris. I thought the problem here was you have to go to the law, the point of law that basically says if you if you're contesting an ultimate finding of fact, you even under issue preclusion, you give up those subsidiary fact issues. You know, basically you treat them as another piece of evidence. And the question, I guess, is what happens when either the issue of fact or the piece of evidence of was there retaliation for the filing of the lawsuit is not raised? Because as I understand it, that wasn't raised. It was not, Your Honor. And it clearly could have been. And the question is, is that a separate issue that could have been raised or is it just part of the evidence that goes to the ultimate finding of fact? And what's the effect of not raising it? Precisely. It clearly could have been raised because filing litigation, filing lawsuits is protected activity under the Pennsylvania Employee Relations Act, PERA. Is it? It is. And so. And you got it. That's that's obvious. That's a clear sign. I can give you the sites. Well, I can give you the sites. In the district court's opinion, the district court points out that that that that is that was certainly our position. And the reference in the district court's opinion is to our brief on post-trial motions where we cite the law, cite the provisions that say the board decisions that say they were. It is a collective action and the collective action is filing litigation that is within the purview of the PLRB. And if you're so they could have raised Watson as a reason for which they were that they would be retaliated against. They didn't. They said it was the refusal to go to Norristown. And the board took the evidence as it found it. What it found was that they looked at and the board said there's no direct evidence of retaliation. And looking at the circumstantial case, it's insufficient. And they didn't mention the Watson case. But you're saying it's a piece of evidence they should have mentioned or they're barred. The plaintiffs should have made that claim at that point. But it's the merger bar. Do I understand that the jurisdiction of the PLRB is exclusive and therefore they had to raise this kind of claim there? It's not exclusive over a 1983 claim, Your Honor. And had they not gone to the PLRB, we believe they could have filed a 1983 suit on this basis. They didn't have to go to the PLRB on a 1983 claim. But what they did was they went on. Wait just a second. I'm confused here. If retaliation for buying a lawsuit is an unfair labor practice, doesn't that have to go before the PLRB? Only if you want to come out with a finding as to whether there is an unfair labor practice. They could have foregone the unfair labor practice route. And instead, I mean they had three options, Your Honor. They could have grieved it. They could have filed for an unfair labor practice or they could have filed a 1983 action. They chose the second option. And a basis for that was retaliation. And they should have at that point given the PLRB all the circumstances that they say caused or reflected retaliation, including Watson, which they clearly knew about. They had filed it. But they didn't. They gave the labor board only part of the case, the circumstantial evidence of retaliation, all this information about how hard this was on them and how. Mr. McGuff, I'd like to ask you about punitive damages. The jury filed liability based on alleged bad action, retaliatory motive. Was that essentially the basis for punitive damages as well? If so, is it your argument that there's a kind of double penalty for the same action? Certainly we argued that there wasn't a punitive damage case here, Your Honor. That's the fourth issue, part of the fourth issue in the brief. And it was almost triple jeopardy to cause it because you had the PLRB there. They're biting the apple at the PLRB. And they're biting the apple at liability. So there's no collateral to stop. Yes. Yes. And this is where it merges into the sufficiency of the evidence. In the Clark County case, the Supreme Court's case, which says timing alone is not sufficient. Is there relevant precedent here that would say the same factual predicate cannot serve as the basis for liability and for the added basis for punitive damages? We said a number of cases in the brief, Your Honor, where—oh, I'm sorry, I misinterpreted the question. The same factual predicate can't serve as a basis for liability and punitive damages. Certainly a case is not sufficient for punitive damages solely because it's sufficient for liability. That's absolutely clear. You have to have something else. And as we suggest in the brief, they didn't have that here. In fact, all they really had, when you boil it down to what they had in the district court, they had the timing of the Watson filing and the transfer, plus they had all the circumstances that they had presented to the PLRB, which the PLRB had already held were insufficient to raise a circumstantial case. So that's why I say that the sufficiency question and the issue of preclusion question—  Well, they did not, Your Honor. That was—and it is alleged conflict. It's not at all clear—certainly that didn't relate to Watson at all. This was a conversation that took place a year after the transfers between Mr. Stiles and General Fischer had nothing to do with Watson and had to do with whether the FBI would go to the same site that these—where these agents might be working. Excuse me, we just dropped a video conference call. Would you mind just holding on to your argument for a moment, please? I'm going to try to reconnect. Sure. I apologize, Judge. Okay. Maybe something's happened in Washington. I hope not. We need Judge Oberdorfer. Are we otherwise connected by audio? No, sir. We're connected—corrected completely through that. Just by video conferencing. Okay. Are you trying to get him back? Yes. And it was only the last question that we lost? Yes. Okay. So we know where we are. Modern electronics is wonderful, but not perfect. Not always reliable. But you do have an audio backup. Hello? And I think rather than waiting for how long, we don't know how long. What's the telephone number? Yeah. Okay. Mm-hmm. Okay. All right, try one more time, and then let's go through. Let me, in the meantime, I'm going to find it. All right. Okay. We can't get Judge Oberdorfer. He can make a whole copy. Yes, we can do that. That's fine. We have a one person audio. Number two, as you said. All right. Have him listen to the tape. One second. We could try to entertain you. I think that's my job, Your Honor. Judges are not chosen for their entertainment potential. Let me go talk to this lady. Okay. Mr. Kramer in Washington is trying to reconnect one more time. If that doesn't happen, then we're going to go to audio conferencing. Okay. Through the telephone. Okay. Okay? And he's going to call me back in a moment to see whether or not I'm on you. Audio conferencing, I will move the telephone up here, and Judge Oberdorfer will be able to hear what happens through the phone. He would not be able to see us. All right. We'll move to the... You might be able to get him on the phone. I understand one of the best qualities of appellate advocates is their visual appearance. But you may have to settle for having a good voice. And a good eye. We'll give them a minute or so more. Sure. In the final analysis, this is being recorded, and Judge Oberdorfer will review the tape. Okay. Okay. I'm going to try to get through the telephone. Yes, they have caught hearing. Yes. I'm going to try to connect him through the telephone. I'm trying to find him. What do you have to say? Okay. Thank you, Mr. Cramer. Bye. Okay. Ms. Lang, if you could connect us with audio, I think we would... I'm working on it, Judge. I'm sorry. I think we are proceeding with audio. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay.         Thank you very much for the presentation. Thanks. Goodbye. Goodbye. Thank you. Bye-bye. Goodbye. Goodbye. Goodbye. Hello? You seem to be having difficulty all the way around today, Judge. All right, and let's... Hello, Mr. Cramer. You seem to be having difficulty all the way around today, Judge. All right. Goodbye. Goodbye. Goodbye.   Goodbye. Goodbye. Goodbye. Goodbye. Goodbye. Goodbye.  Ms. Lyon, I think we ought to proceed. We thank you for your efforts. Ms. Lyon, could you... Yes. ...set the time clock? Yes. All right. Start the clock, Judge? Is that what you want me to do? Well, resume where it was. Here. I can't get it. I can't get it. I can't dial it in here. I can't do the audio. Thanks. Bye. All right. I'll reset... I'll reset the clock, Judge. To where we were. Yes. It's probably red. It's okay. Hang on for a minute. I think we're down to about three minutes on the remaining first argument. Does that sound right? I think that's fine. All right. Let's continue. Okay. Judge Rustani, I think you had a question. I was in the middle of my question about circumstantial evidence included alleged conflicting testimony. And you were saying that it wasn't relevant because it came later. But I suppose it's relevant in how the jury assesses it. Excuse me, it was conflicting. I think when I stopped, I was taking off the reasons why it was non-probative. Certainly on the issue of whether Watson was the reason for retaliation. One, it came a year after the filing of Watson or this discussion came, a year after that. Secondly, and we cited the passages in the briefs, I'm not sure there even really is a direct conflict between the testimony. But third for us, most importantly... Well, let me ask you that. Sure. Yes. The jury had those two things before them. If we think there's a possible conflict, then the jury gets to assess it, correct? Yes. The short answer is yes. Okay. So in order to throw that out, you would have to say, look, on the face of it, there's no conflict. In order, you'd have to say, in or on the face of it, there's no conflict. And we believe that's correct if you look at the testimony. And quite frankly, we don't know what the jury relied on, obviously. We don't know whether they focused on that or not. But the court can compare the testimony, and I don't believe there's a conflict there. But it also is not a conflict that is relevant, that is provative at all, of Watson as being the reason for retaliation, or even of retaliation at all. Because the issue that the conflict swirled around, or the alleged conflict, was whether Mr. Stiles told Mr. Fisher the agents could work, the FBI would work on the same premises. The agents weren't transferred because they couldn't physically work, be present at Essington. They were transferred because there was nothing for them to do at Essington. That's why that particular dispute is not really provative of anything. I'd like to ask you a couple of questions about the PLRB proceeding. I want to go back to that for a second. First of all, as you know, the unemployment compensation cases go off a great deal on the fact that this is a truncated proceeding in order to get benefits to unemployed employees. Okay, so how formal is the PLRB proceeding, and what standard is the trier effect applying? I could not understand this from the Pennsylvania cases. It says substantial evidence, but I understand that as an appellate standard of review. And I want to know if the PLRB is deciding things, at least on the trial level, on preponderance and according to formal proceedings. I believe that is the case, Your Honor, that the standard is preponderance. Even though this Court of Appeals calls it substantial evidence. Right, and then there's review of the administrative determination on substantial evidence. That I understand. I'm sure you do. As far as the proceedings, they are as formal, essentially almost as formal as the parties want to make them. They have the right to subpoena. They have the right to cross-examination. You have the counsel participate. There are even provisions for discovery, to request discovery in aid of the hearing. So it's far beyond the sort of unemployment compensation referee who, in ten minutes, makes a quick ruling. There's opportunity to prepare, to call witnesses, to compel testimony for discovery if requested. And indeed, a fair amount of formality and importance given to those proceedings. While the PLRB proceeding in this case may have only lasted an afternoon or a morning, the whole trial here only lasted four days, including jury selection and all of that. So it was not that far off. And had the plaintiffs really believed that they were retaliated against for filing Watson, that's where they should have brought it up, at the risk of issue preclusion. Having elected that remedy, we believe it was inappropriate for them to give one case to the PLRB and then an entirely different case, the same case, but with just one fact changed, one contention changed to the jury. But the only thing that would get them into federal court is that one fact, a First Amendment claim. How else are they going to go into federal court on a 1983? But having elected to file the unfair labor practice claim, they owed it to the PLRB, they owed it to the court later, to provide the PLRB with all the facts, all the claims that could have been asserted in that proceeding, so that when the PLRB said, we don't see any retaliation here, the PLRB could mean it. Well, you've got to make sure you're not confusing issue preclusion and claim preclusion. I understand that. You mean all the evidence that would have supported the finding of ultimate fact? Well, yes, Your Honor. And all the reasons why the retaliation was supposedly conducted. They told the PLRB, this retaliation was for reason A. And then when they got to the jury, they said, whoa, whoa, whoa, no, that's not right. This retaliation was because of reason B. Forget A. Let me ask you this. Is the offer permanent? Hello, Judge? Excuse me. I'm sorry. Hello, Judge? I can hear you, but can you hear me? Yes, I can hear you, Judge. That's not Judge Oberdorfer. That's not Judge Oberdorfer. Judge Oberdorfer, are you there? We're here. We can hear you. You can't hear us. All right. Well, let's just proceed. I have one. Hello? Anybody there? Yes. Okay. Have you been able to hear us? Yes, we have. Okay. We're just trying to confirm that you can at least hear us. Yes, we can. We can hear you. Okay. How about now? Yes. Okay. All right. Should I go on with my next question? Please. My next question is, what happened to the offer of permanent employment at Norristown? Is it out there? Or was it out there? It was out there. Was it out there at the time they temporarily transferred them to those other two places? It was out there as of October 14th. I don't believe it was ever formally withdrawn. Okay. Thank you, Mr. McGuff. Now, let me ask the parties, would you prefer to proceed as we're proceeding now? And it's unfortunate, but we apologize for the disruptions. Would you prefer to have the two-thirds of the panel adjourn and let some time elapse and see if they can fix it? Or would you prefer to proceed? Good morning, Your Honors. My name is Sam Stratton. I prefer to proceed now as long as it's being recorded so Judge Oberdorfer can hear it and make his decision based on the facts. That's what I think would be the best move. It is being recorded, Ms. Lang. Thank you. Let us proceed. I'm Sam Stratton. I represent John McLaughlin and Charlie Michewski in this particular matter. I want to give Mr. McGuff great praise for his very good argument on the pressure with all the excitement going around. And Mr. McGuff and I tried a case 20 years ago. It's nice to be in the same courtroom with him again. Let me get to the merits of why we're here now. On this issue preclusion that they raised, there's a couple of points I want to make and then I want to discuss the law. First, if you read their new act or affirmative defenses, they don't raise it. Issue preclusion is never raised in their answer in the new matter. It was raised in pretrial motions. Second, if you read and look at the essence of the labor relations matter, it's a contractual claim under the collective bargain agreement. Now, they were being retaliated because they refused to accept on October 6, 1997, the transfer to Norristown from Essington. And in that particular transfer, the labor board found that there was no union anger. The actual language in their report is I have it right here. However, the record is void of any direct evidence of any anti union motive or other evidence which support an inference of anti union. And that is from the report, the final order of the Labor Relations Board, which is contained somewhere in there in the reproduced record. So what you had there was a very limited argument, a very limited case on contractual rights, because clearly under the contract, the union had the right to try. I mean, the employer had the right to transfer. The question was whether they were really retaliating for their refusing the offer in Norristown. Now, could they have raised the First Amendment in the union proceedings? The answer is no. In fact, Don Bailey, who's my co-counsel, tried to go in the proceedings and was precluded, locked out, not allowed, because there's nothing to record that, because we don't have the record of that particular proceeding in this particular matter. And remember, it's entitled the union versus the Commonwealth, although I understand the concept of privity in these particular matters. But his argument is that the jurisdiction of the PLRB is very broad and that it would be an unfair labor practice, I guess, to fire someone or transfer them because they filed a lawsuit about their employment conditions. And if it's two union members doing it together, they're acting in concert. So you're telling me that there is some legal authority that will make it clear that they could not have raised as an unfair labor practice the filing of a lawsuit? I'm telling you this, that I know of no case that it says that they can litigate a First Amendment civil rights 1983. Well, that's not what I asked, was it? No. I can tell you that I'm not aware of any case, and I'm not a labor law expert, I'll be the first to admit, where one has raised a retaliation based on speech or a lawsuit in this particular matter. Under the Labor Relations Act under 1201, there are a whole slew of areas, interfering, restraining, coercing employees in the exercise of rights guaranteed under Article 4. Then dominating or interfering with the formation, existence, or administration of an employee organization. And they go down the line, but they're all contractual matters. But keep in mind, they're represented by union counsel in this particular case. They can intervene on their own behalf if they don't like their union counsel. Well, it's within the discretion of the hearing examiner and or, I guess, the board if an intervention petition is filed. They weren't aware of that particular right, and there's no evidence that the union so indicated. Let me ask you this. The hearing examiner made this finding of fact, that they were transferred for a business reason. Now, presumably, the facts that he considered in deciding that were this fact of retaliation because of the rejection of the permanent assignment. But... You see, he didn't have certain information. I know he didn't have that information. The question is, did he have to have that information? If you're putting before the examiner the question of what was the motive for this transfer, and you have two evidentiary reasons that you want to put before him, and one is retaliation on one count and one is retaliation on another count, the question is, do you have to put them there? And one answer is, well, no, because we can't because it's not in their jurisdiction. And that's what you're arguing, and he's arguing the opposite. And so if he's right, then the answer is, what was the finder of fact actually deciding? And if he's deciding that the only reason for the transfer was a justified business reading, then that precludes the other evidence. If it's in his jurisdiction. If it's not in his jurisdiction, you win on that point. But it's in the context of where the evidence wasn't presented and the finder of fact was not aware of the October 14, 1997 lawsuit that had been filed by my clients against Judge Fisher and others in this particular matter. I don't think his knowing about it is the answer. I think the question is, did you have the obligation to tell him about it or not? Or, remember, it's the same parties in privity. Did they have the obligation, that is, both sides were aware of it, and did they have the obligation to raise it either by way of defense or by making a full and complete record? Now, remember, under the rules of professional conduct, if you believe that it should have been raised, both sides have to raise the issues that are of consequence. Because look at the facts here. So you've got to keep the facts. October 6, these gentlemen are brought in, told, go to Norristown. They're thinking about it. They say no. October 14, they both get a letter saying, reconsider Norristown. We're reaffirming. We want you to transfer. Same day, the lawsuit's filed and served by Mr. Bailey or Judge Fisher and others on that particular day. After that, all the testimony that is from every witness, I asked them, any more discussions about Norristown? Did you go to them and say, what are you going to do on the October 14th letter? Any discussions why now we're going to Greensboro, 300 miles away, or Williamsboro, 100 miles away? Every defendant I asked. Mr. Stratton, let's just change the issue here, if you don't mind. What is the standard of review on the award of punitive damages? The standard of review would be whether or not there is sufficient evidence to support the same. What is the evidence justifying the award of punitive damages over and above the evidence that justified the liability verdict? Well, first, I'm not sure you can make the distinction. There has to be A and B. Just a normal case, a drunk driver runs me down. I have a good claim for damages and also probably a good claim for punitive damages, and it's the same factual scenario. In this case, there was ample evidence of ill motive, ill intent, callous disregard. These men were transferred to far away from their homes without notice, but their real ill will is shown how they were treated thereafter. My client's father, John McLaughlin, had a heart attack. He asked to stay with his father. He was told if he didn't immediately go to Greensboro, he would be fired. He then also had injuries, work-related injuries, where he was treating with a neurologist here. You mean every supervisor who, for what may well be legitimate business reasons, declines to give permission for a subordinate to attend to a family health event is guilty of liability? No, obviously I'm not saying that, but what I'm saying is this was all as part of a factual scenario which the jury found in our favor of callous disregard. When he goes out there, he has to stop every 45 minutes because his back hurts so much. He couldn't get treatment out of Greensboro. When he's out there, there's no work for him. He sits there in a cubicle for five months. There's nothing to do. Mr. Michewski is so depressed about it, his supervisor, Mr. McGinnis, testifies, I'm afraid he's going to hurt himself. He's going to kill himself. Now does this apply to both Mr. Papert and Mr. Quaint, both of whom were held liable for punitives? Yes, because they were aware there was Mr. McLaughlin and Mr. Michewski testified that everything was sent for the chain of command, which included both those individuals. And keep in mind, we also have P-15. And this goes to both punitive and also to your question, Judge O'Stanley, about the ill will here. P-15 is a memo that the Labor Relations Board didn't have. Oh, you mean the Three Amigos memo? Yes, they didn't have it. We got it. Why is that so important? I didn't see anything terrible in there. Okay, well explain it to me. I want to understand. Like, for instance, let's break them up. Let's move them to three separate offices. Let's write them up frequently. You know, you start to see, in terms of a union hearing, this would have probably suggested there was the animus that was found lacking. We get this two or three days before a trial. It's faxed anonymously to us. Never provided in discovery or anything else. And the union hearing was totally devoid of that. And, going back to your question, Judge Lori, I do need to jump back to preclusions. We're a panel. I understand that. I think that also demonstrates the state of mind because Mr. Pepper, when we had him questioned him, discussed briefly what his reasons were, and he denies the Noonan report. Then in a letter he says, and of course we confront him with the fact he had read the Noonan report. The Noonan report was a report in-house where Mr. Noonan, who unfortunately was passed away at the time due to a car accident, or a heart attack, I forget which now, which these in-house suggested they were exonerated to some extent in this particular matter. And I don't know if the Noonan report was ever referenced in these particular proceedings. So, let's go back. I suggest to you, Judge Lori, that there is ample evidence of the callousness and indifference. I'm not going to give you the jury argument, but I suggest it's there, particularly if you apply the standard review, which I suggest is a sustained standard review on evidentiary matters. It was nice to be in the appellate. I'm so used to being in the appellate when I'm running upstream. But let me go back to where this case probably rises or falls. The Three Amigos memo. I wasn't focusing on let's write them up frequently. Was there any allegation that as a result of that memo they got written up for things they didn't do or unfairly? That, of course, wasn't concentrated on during the trial because we focused on using that just to show a mindset of the individuals. Our focus was October 14th, the lawsuit involving Mr. Fisher, what we call the Watson lawsuit. Did you argue that that memo was new evidence that precluded the newly discovered evidence that should have prevented issue preclusion? No, because we didn't know about it at the time. Those decisions had been made by Judge Caputo. We didn't have that memo at that time. When you argued to the district court. When you made your argument to Judge Caputo in the district court and he ruled for you on that issue. I don't believe he had the memo at that time. Oh, that was pre-trial and you got this? Yes. Okay. You got this later. During the trial. I'm going to keep it long. There's no further defenses raising this, which I just found interesting.  Wait just a second. They raised it pre-trial. Pre-trial. And Judge Caputo didn't say you're barred because you didn't put it in your answer. He considered it. I didn't say that. Okay. And he ruled in your favor. That's right. But I just want you to have the total context. But let's go back to the difference in these proceedings. And, you know, sometimes the law becomes too technical. For instance, the Ruhl case, the one that raises the question. The Petainenship case. Yeah, the Petainenship case. That's a libel slander case. So did you steal or did you steal? The Supreme Court said we're not going to worry about these policy issues, difference. If the fact's determined against you, fine. But, unfortunately, you didn't have the opportunity to litigate. Therefore, you're out of line. But that was a very limited thing. The issue was real clear. A libel slander case, too. But it's true or false. This is not that kind of case. If you're going to decide against us on this issue of preclusion, it's not because of what was in that particular hearing. These issues weren't litigated in that particular hearing. That hearing examiner had no knowledge and had a very pristine view of what happened after October 14th. And probably rightly decided there was no union in this. But that's not the case. Now, the question is, could they have raised that with a union lawyer? And could we have intervened? Could we? Should we? There's no evidence. You always would have to take evidence. Were they advised by the union counsel to intervene? Did they know about that? We don't know those answers. I know them, but they're not part of the record. I don't know that that's relevant. Can I ask a question about sufficiency? Yes. Okay. It seems to me that there's two big things you have. You have timing, and you have this supposed conflict in evidence. I actually didn't see any conflict in that evidence. So besides that, the question is, I didn't see the conflict. So the question is, is there enough there for a jury to see a conflict? Absolutely. Why? Because it sounds to me that the judge said there was a conflict there. Judge Caputo clearly saw it. Yeah. And I'm just now, it seemed to me that the issue they were talking about was, did the district attorney have a problem with using them in trial? Clearly, everybody says that's true. They couldn't testify on new cases. Which also gets rid of another supposed circumstantial evidence. They were testifying on some old cases where they had been the investigating officers. They were testifying up through 2000, 2001. Right, on old cases. But on new cases, the DA didn't want them. I understand. Okay, so everybody agrees on that. And so that's what the questions were about initially. And then later on what happens is Mr. Stiles says, well, there's different entrances and different equipment, and so they could be in the same physical offices because there's different entrances and different locations. And then Mr. Fisher says, well, remember what we're all talking about. We're talking about they're not testifying in cases. What was the conflict? The conflict was, and now I can pull the testimony out, that Mr. Stiles said, I never told none of Mr. Fisher that I would be uncomfortable with them being there. Mr. Fisher said, denied that, and said Stiles never indicated that to him. And that was, and there's plenty of record that supports that for a jury to find. All right, Mr. Stiles said, I never said it, because I thought Mr. Stiles clarifies that he said it initially, and then when he found out there were different entrances and stuff, he then said, okay, they can be in the same place. I believe that's correct, but I think the bottom line from my recollection of Mr. Stiles' testimony was, the bottom line was that he indicated that I never told Attorney General Fisher that I would object to these men being there. And Mr. Fisher, and Mr. McGaugh quotes this in his brief, denied that, though he denied it in a very, he wouldn't answer my questions, I kept coming back and back and back, and the jury saw that. But it's more than just that denial for sufficiency of evidence, it's the whole course. Some of them have an open letter, it's October 14th, then November 5th and November 12th they're transferred, they're told to leave, they're told they can't be with their family, they're told they're staying there, and then they come out there and there's no work for them. This isn't, and see, the arbitrator didn't have that. He didn't know. There was absolutely no work, and he sat there, both of them, in a cubicle for six months doing nothing. I'm way over my time, and I apologize. Well, you're answering a question. You're asking a question, so you can talk. You finished that question? Yes, I'm sorry. Okay. Anything further? No. Thank you, Mr. Stratton. Thank you, it's a pleasure to be here. Thank you very much. Even under the circumstances. Mr. McGuff, you have four minutes, we'll give you five. Thank you, Your Honor. First of all, on the question of what happened before the PLRB and what could have happened, as I understand Mr. Stratton's argument, it is basically that the plaintiffs here have a beef with their union about what happened. Mr. Bailey may have wanted to raise points. This wasn't in the record, but apparently Mr. Stratton and Mr. Bailey may have wanted to raise points that the union didn't want to raise. That's at best an unfair representation claim, and it doesn't change the analysis of what needed to be admitted before the PLRB. As for the jurisdiction of the PLRB, the district court noted at page 27 of the appendix that the defendants had pointed out and cited authority for the fact that the Watson retaliation could have been raised before the PLRB. That was not really counter-briefed by the plaintiffs alone and wasn't apparently an issue. For the court's benefit, I would cite the court to number 113 on the docket, which is the memorandum in support of the post-trial motions where the authority is cited. Of course, we'd be happy to provide supplemental authority to the court if that should be a question as to whether a retaliation for collective filing of a legal action was cognizable. Let me ask a question about the Three Amigos memo. You pointed out statements in there that he says show animus and bad will. If that wasn't known to plaintiffs at the time of their PLRB hearing, does issue preclusion apply? I don't think it has anything to do with issue preclusion. First of all, there were four Amigos at that point. It was one year before Watson, one year before the Norristown offer. If anything, it completely eviscerates the plaintiffs' claim that they were retaliated against because of Watson or Norristown. They want to point back a year and say, see, they had bad animus. Let's assume that there was bad animus. That's not actionable animus. In order to be actionable animus, they need Watson to be the reason or they need Norristown to be the reason, and they don't have either. The Amigos memo doesn't help them at all on that. What you had was really the Office of Attorney General trying to find an acceptable solution to an utterly impossible situation. They had agents who they couldn't use as agents. They couldn't dismiss them. They had to try to find a place to use them, to make them productive employees. They couldn't work cases, which is what they had done up to that point. Therefore, there was no work for them to do at Essington. The OAG tried to offer them a permanent transfer to Norristown, which is kind of like taking the heat out of the kitchen, even though they would have been overstaffed to Norristown. That was a concession by the OAG, and that was turned down by these agents. As I recall, the counteroffer was, yes, we'll go to Norristown if we can do narcotics investigations. Yes, which wasn't going to happen. The OAG did not feel it could put these agents on cases where the United States Attorney for the Eastern District of Pennsylvania and the District Attorney for the City of Philadelphia had said, we're not going to bring any cases where these folks are involved. I'm assuming it's not issue precluded. On the sufficiency, this is really tough with a jury verdict. There's a lot of stuff going on there. In order to win on non-sufficiency, you basically have to get rid of everything and be down to timing and then argue that this timing is not unusually suspect. That's why I say issue preclusion relates to the sufficiency. What I'm suggesting is where all you've got, you've got timing, and you have other stuff that the PLRB has already said is insufficient. That's the same thing, that that is insufficient. The totality of the circumstances is what the PLRB looked at. It looked at timing plus totality of the circumstances. Now, the timing they were looking at was Norristown. If we say nothing is issue precluded, then where are you? Where we are is with sufficiency, Your Honor. Because you want to get back to issue preclusion. I'm just giving you a hypothetical. You're not going to let me go back to it. The PLRB, we're wiping it out on a clean slate. What you've got then is timing plus what Judge Caputo called the totality of the circumstances. All I'm suggesting is the totality of the circumstances indicate no more on their face than they did to the PLRB. That is, there is no evidence from which one can infer a retaliatory motive based on Watson. The three amigos or four amigos memo doesn't help you. The Essington conversation doesn't help you because none of that points to Watson as being the reason. And the PLRB found that none of it pointed to the Norristown situation as being the reason. It doesn't point to a retaliatory motive. So even if it was animus going back a year, it's not probative of retaliation. That's the sufficiency argument. My time is up. We would ask the court to reverse the judgment below. Thank you, Mr. McGuff. We have both arguments. Sorry for the disruption. The case will be properly decided. Take it under advisement.